No. 12-5171

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

PATRICIA A. BROOKS,

Plaintiff-Appellant,

v.

SUSAN TSUI GRUNDMANN, Chairman, Merit Systems Protection Board,

Defendant-Appellee.

_____

On Appeal from the United States District Court
for the District of Columbia
_____

**INITIAL BRIEF OF APPELLANT PATRICIA A. BROOKS**
_____

Anne King, D.C. Bar No. 996578
Brian Wolfman, D.C. Bar No. 427491
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW, Suite 312
Washington, DC 20001
(202) 662-9546


*Counsel for Appellant*


March 19, 2013

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

The parties appearing before the district court and this Court are plaintiff-appellant Patricia Brooks and defendant-appellee Susan Tsui Grundmann, Chairman, Merit Systems Protection Board. There are no intervenors or amici.

## B. Rulings Under Review

Plaintiff-appellant seeks review of the Memorandum Opinion of the United States District Court for the District of Columbia in *Brooks v. Grundmann* (1:08-cv-00100-RCL), R. 82, and the Judgment, R. 83, granting summary judgment to defendant-appellee and dismissing the action with prejudice, both entered on March 29, 2012. These orders were issued by Chief District Judge Royce C. Lamberth. The Memorandum Opinion is officially reported as *Brooks v. Grundmann*, 851 F. Supp. 2d 1 (D.D.C. 2012).

## C. Related Cases

This case has not previously been before this Court. Plaintiff-appellant is unaware of any case that is related to this case within the meaning of D.C. Circuit Rule (28)(a)(1)(C).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ................................................................. iv

GLOSSARY ................................................................................... vii

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION ....................................................2

STATEMENT OF ISSUES .................................................................3

STATUTES AND REGULATIONS ....................................................3

STATEMENT OF FACTS AND OF THE CASE ................................3

   I.   Chronology of key events from 2005 to 2008 ...........................4

      A.  The arrival of Tommy Hwang ........................................4

      B.  Tommy Hwang's outburst ..............................................5

      C.  Mediation proves unsuccessful. ....................................6

      D.  Ms. Brooks contacts MSPB's EEO Office and receives a "Minimally Successful" performance rating. ..............................................7

      E.  Ms. Brooks files her first and second formal EEO complaints .....................9

      F.  Ms. Brooks files a third formal EEO complaint and receives an "Unacceptable" performance rating. ..........................................12

   II.  The atmosphere at IRM .......................................................13

   III. Disparate treatment of Ms. Brooks .....................................16

      A.  Teamwork and communication .................................17

      B.  Work time and attendance at Team Leader meetings ...............20

      C.  Alleged work delays and performance problems ........................21

   IV. Effects on Ms. Brooks' health and well-being ...............................23

   V.  Proceedings and decision below .......................................23

SUMMARY OF ARGUMENT ..........................................................24

ARGUMENT ...................................................................................................26

   I. Standard of review.................................................................................26

   II. A reasonable jury could find for Ms. Brooks on her hostile-work-environment claim...............................................................................................27

     A.  The district court ignored or inappropriately discounted relevant facts that support a hostile-work-environment claim. .................................................28

     B.  A reasonable jury could conclude that MSPB's harassment unreasonably interfered with Ms. Brooks' work performance by creating a hostile work environment..................................................................................................31

       1. Frequency ...............................................................................................31

       2. Severity...................................................................................................32

       3. Humiliation.............................................................................................34

       4. Interference with Ms. Brooks' work performance ...................................36

     C.  A reasonable jury could conclude that MSPB's harassment was based on race, sex, and retaliation. ...............................................................................38

       1. The harassment was based on race and sex discrimination. .....................38

       2. MSPB engaged in a pattern of retaliation against Ms. Brooks. ................40

   III. Ms. Brooks' claim that MSPB perpetrated discrete acts of retaliation should have been addressed by the district court and now should proceed to trial. ..43

     A.  The district court erred in failing to consider whether Ms. Brooks maintained a retaliation claim. ..................................................................43

       1. Second Amended Complaint....................................................................44

       2. Summary-Judgment Opposition...............................................................46

     B.  A reasonable jury could rule for Ms. Brooks on her discrete retaliation claim. ................................................................................................................47

CONCLUSION................................................................................................52

CERTIFICATE OF COMPLIANCE …………………………………………………

CERTIFICATE OF SERVICE …………………………………………………….

ADDENDUM ………………………………………………………………………

# TABLE OF AUTHORITIES

## CASES

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).....................................................27

\* *Baird v. Gotbaum*, 662 F.3d 1246 (D.C. Cir. 2011) ................................... 30, 45, 47

*Baird v. Snowbarger*, 744 F. Supp. 2d 279 (D.D.C. 2010) .....................................47

*Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008)...................... 24, 28, 29, 33

*Barbour v. Browner*, 181 F.3d 1342 (D.C. Cir. 1999) ...........................................27

*Beardsley v. Webb*, 30 F.3d 524 (4th Cir. 1994) ....................................................27

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...................................................44

*Betts v. Costco Wholesale Corp.*, 558 F.3d 461 (6th Cir. 2009) ............................28

*Brooks v. Grundmann*, 851 F. Supp. 2d 1 (D.D.C. 2012) ........................................ i

*Burke v. Gould*, 286 F.3d 513 (D.C. Cir. 2002).....................................................49

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) ................................... 45, 50

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).............. 42, 46, 48

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................26

*Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000)...................................................50

*Curry v. Dist. of Columbia*, 195 F.3d 654 (D.C. Cir. 1999)...................................27

*Dey v. Colt Constr.*, 28 F.3d 1446 (7th Cir. 1994) .................................................34

*Erickson v. Pardus*, 551 U.S. 89 (2007) ................................................................44

*Forkkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002) ......................................... 49, 50

*Franklin v. Potter*, 600 F. Supp. 2d 38 (D.D.C. 2009) ..........................................47

*Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir. 1995).......................................34

*Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012)......................... 32, 33, 36, 37, 42

*Harding v. Gray*, 9 F.3d 150 (D.C. Cir. 1993) .......................................................39

\* Authorities on which we chiefly rely are marked with asterisks.

\* *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) .................................. 28, 29, 31, 47

*Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950 (10th Cir. 2012) ................27

\* *Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ................ 40, 47, 48, 49, 50, 51

*Howard v. Burns Bros.,* 149 F.3d 835, 840 (8th Cir. 1998) ...................................28

*Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009)........................................... 40, 42

*Lester v. Natsios*, 290 F. Supp. 2d 11 (D.D.C. 2005) ...............................................47

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843 (D.C. Cir. 2006)............. 38, 39

*McCready v. Nicholson*, 465 F.3d 1 (D.C. Cir. 2006)...............................................27

*McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973)......................................46

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)......................... 24, 28

*Noviello v. City of Boston,* 398 F.3d 76 (1st Cir. 2005) ................................... 33, 36

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) ...........................34

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).....................38

*Russell v. Principi*, 257 F.3d 815 (D.C. Cir. 2001) ..................................................49

*Singletary v. Dist. of Columbia*, 351 F.3d 519 (D.C. Cir. 2003)................ 31, 36, 40

*Smith v. Jackson*, 539 F. Supp. 2d 116 (D.D.C. 2008)............................................47

*Steele v. Schafer*, 535 F.3d 689 (D.C. Cir. 2008) ...................................... 26, 45, 49

*Vera v. McHugh*, 622 F.3d 17 (1st Cir. 2010) .........................................................27

*Vickers v. Powell*, 493 F.3d 186 (D.C. Cir. 2007)...................................... 30, 31, 37

*Weber v. Battista*, 494 F.3d 179 (D.C. Cir. 2007) ...................................................49

## STATUTES

28 U.S.C. § 1291 ........................................................................................................2

42 U.S.C. § 2000e–16(c)............................................................................................2

42 U.S.C. § 2000e-5(f)...............................................................................................2

**RULES**

Fed. R. Civ. P. 56(c)...........................................................................26

Fed. R. Civ. P. 8(a)(2)........................................................................44

Fed. R. Civ. P. 8(d)(1)........................................................................44

## GLOSSARY

**EEO**   Equal Employment Opportunity

**IRM**   Office of Information Resources Management,
      Merit Systems Protection Board

**MSPB**   Merit Systems Protection Board

# INTRODUCTION

Until 2005, Merit Systems Protection Board (MSPB) employee Patricia Brooks was a respected information technology professional with a long history of government service. But when Tommy Hwang came to MSPB to head the agency's Office of Information Resources, Ms. Brooks' career began to deteriorate. "As soon as [Mr.] Hwang walked in the door," R. 72-1 at 77:7-8, he and his deputy, Nick Ngo, began a campaign of harassment that would threaten Ms. Brooks' job, damage her reputation, isolate her from her co-workers, and cause her significant stress.

Under Mr. Hwang's leadership, Ms. Brooks, an African-American woman, was treated far worse than her white and Asian male peers. She was subjected to bullying and humiliation by her supervisors and co-workers, including one incident when Mr. Hwang erupted at her while she was giving a presentation and threw a notebook toward her. Mr. Ngo accused her of falsifying her time records. And she began receiving poor performance reviews, the worst of her career.

When Ms. Brooks reported Mr. Hwang's and Mr. Ngo's conduct to the agency head and the agency's EEO office, the situation only worsened. Mr. Hwang and Mr. Ngo openly expressed disdain for Ms. Brooks' protected activity, and they exacted reprisal on the heels of that activity. She received one poor performance review only days after a joint meeting with MSPB's EEO Director.

1

The district court, in granting summary judgment to MSPB on Ms. Brooks'
hostile-work-environment claim, did not consider the entirety of the record. The
court overlooked several key facts, discounted the significance of certain events,
and mischaracterized other incidents. Moreover, the district court did not address
Ms. Brooks' claim of discrete acts of retaliation, even though the record reflects
several serious reprisals that could dissuade an employee from exercising her Title
VII rights. For these reasons, and many others discussed below, the district court
decision should be reversed and the case remanded for trial.

## STATEMENT OF JURISDICTION

Appellant Patricia Brooks brought this Title VII action against Neil McPhie,
then-Chairman of MSPB, an executive agency of the United States. The district
court had subject-matter jurisdiction under 42 U.S.C. §§ 2000e-5(f) & 2000e–
16(c). R. 28. On March 29, 2012, the district court entered a final order granting
summary judgment to defendant-appellee, disposing of all claims of all parties. R.
83. On May 24, 2012, appellant filed a notice of appeal. R. 86. This Court has
jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the district court erred in finding that Ms. Brooks failed to establish a triable hostile-work-environment claim based on race, sex, or retaliation.

2. Whether the district court erred in failing to address Ms. Brooks' discrete retaliation claim.

## STATUTES AND REGULATIONS

Pertinent statutes are contained in the attached Addendum.

## STATEMENT OF FACTS AND OF THE CASE

This section reviews the factual basis for Ms. Brooks' claims that MSPB supervisors subjected her to a hostile work environment based on race, sex, and retaliation and perpetrated discrete acts of retaliation, and then describes the history of this case. Part I reviews key events from the relevant time period, 2005 to 2008. Part II describes how Ms. Brooks' supervisors fostered an atmosphere of isolation, intimidation, and unfair treatment targeting Ms. Brooks specifically and African-American women in general. Part III describes how Ms. Brooks' supervisors held her to higher standards than her white and Asian male peers who had not engaged in protected activity, particularly in the context of performance reviews. Part IV describes the effect of this conduct on Ms. Brooks. Finally, Part V briefly outlines the procedural history of this case and the decision below.

3

## I.  Chronology of key events from 2005 to 2008

### A.    The arrival of Tommy Hwang

Patricia Brooks, an African-American woman, has been a GS-14

Information Management Technologist in MSPB's Office of Information

Resources Management (IRM) since 1998. R. 70-5 at 1. In January 2005, An-Ming

(Tommy) Hwang (Asian male, Senior Executive Service) became IRM's Director

and Ms. Brooks' second-level supervisor. R. 70-39 at 1. Her first-level supervisor

was IRM Deputy Director Nick Ngo (Asian male, GS-15). R. 70-5 at 1; R. 70-38 at

1. Ms. Brooks had worked for Mr. Ngo before Mr. Hwang took over the office,

and she received an "Exceeds Fully Successful" performance evaluation from Mr.

Ngo in 2004. R. 61-6 at 3; R. 72-2 at 66:5-16.[1]

Ms. Brooks was one of several IRM Team Leaders responsible for

overseeing different areas of IRM's work. R. 70-4 at 2; R. 72-5 at 66:8-67:3. The

other Team Leaders during the relevant period were Elliot Hoang (Asian male),

Teresa Jefferson (African-American female), Bill McDermott (white male), Craig

Thomas (white male), and Katherine Turner (white female). R. 70-4 at 6; R. 70-19;

R. 72-5 at 66:8-67:3. All were GS-14s for the relevant period, except Ms.

---

[1] Performance ratings at MSPB include "Outstanding," "Exceeds Fully
Successful," "Fully Successful," "Minimally Successful," and "Unacceptable"
(sometimes referred to as "Unsatisfactory"). R. 70-27 at 1; R. 70-31 at 1, 2.

Jefferson, who was a GS-13 until promoted in 2008. R. 70-8 at 8; R. 72-5 at 66:8-68:6.

As Ms. Brooks later recalled, her problems started "as soon as Tommy Hwang walked in the door." R. 72-1 at 77:7-8. Around January 2005, Mr. Ngo told Ms. Brooks that people were asking why she was a GS-14. *Id.* at 88:11-89:23. At the time, Mr. Ngo claimed IRM had too many GS-14s, *id.* at 90:5-15, but he and Mr. Hwang hired Mr. Thomas (white male, GS-14) in July 2005. R. 72-4 at 136:8-11. Then, at a meeting in April 2005, Mr. Hwang and Mr. Ngo criticized Ms. Brooks' progress on a project that involved migrating Lotus Notes documents, although they had not yet given her any guidance on the project. R. 70-4 at 8.

## B. Tommy Hwang's outburst

On May 11, 2005, Ms. Brooks gave a dry run of a presentation in front of nearly the entire IRM staff. R. 70-4 at 2; R. 72-3 at 130:7-14. In the middle of Ms. Brooks' presentation, Mr. Hwang erupted in anger, shouting at Ms. Brooks in front of her co-workers, slamming his fist on the table, and criticizing her performance. R. 70-4 at 2; R. 72-3 at 125:4-126:18. Mr. Hwang then asked most of the IRM staff to leave, but he continued yelling at Ms. Brooks in front of Mr. Ngo and Mr. McDermott. R. 70-4 at 2; R. 72-3 at 125:4-18. Then, Mr. Hwang threw a heavy notebook on the table toward Ms. Brooks, which frightened her and caused her to leave the room. R. 70-4 at 2.

5

The same day, following the first step in MSPB's EEO process, Ms. Brooks reported the incident to Mr. Hwang's second-level supervisor, MSPB Chairman Neil McPhie.[2] *Id.*; R. 70-22 at 1; 70-35 at 1. Mr. McPhie referred her to his Chief of Staff, Tracey Watkins, Mr. Hwang's first-level supervisor. R. 70-4 at 2; R. 70-35 at 1. Ms. Brooks met with Ms. Watkins and described Mr. Hwang's outburst, explaining that she felt frightened, embarrassed, and demeaned. *Id.* Ms. Watkins called Mr. Hwang and recommended mediation. *Id*. Then, immediately after the meeting with Ms. Watkins, Mr. Hwang bombarded Ms. Brooks with a series of emails (at least eight in two days). *Id.* at 2, 8-9. In the emails, Mr. Hwang demanded that Ms. Brooks provide extensive explanations about projects they had already discussed, and he incorrectly claimed that certain tasks were incomplete. *Id.* at 8-9.

## C. Mediation proves unsuccessful.

Ms. Brooks and Mr. Hwang attended mediation at the Federal Mediation and Conciliation Service in June 2005. *Id.* at 1, 3; R. 70-6 at 1. Nevertheless, in the following months, Mr. Hwang's and Mr. Ngo's treatment of Ms. Brooks did not improve. In October 2005, when Mr. Hwang and Mr. Ngo conducted Ms. Brooks' performance appraisal for FY 2005, they criticized her management skills and

---

[2] The first step of MSPB's EEO policy provides that, if an employee is not comfortable speaking with the perpetrator, the employee may report discrimination to her supervisor or her supervisor's manager. R. 70-22 at 1.

lowered her performance rating to "Fully Successful" (a drop from her 2004 rating

of "Exceeds Fully Successful"). R. 61-6 at 3; R. 70-4 at 4-5. Mr. Hwang and Mr.

Ngo also proposed rearranging Team Leader meetings to exclude all three female

Team Leaders, but Ms. Brooks told them it looked discriminatory. R. 72-1 at

175:18-176:2.

Then, on several occasions, especially during January 2006, Mr. Ngo

insisted that Ms. Brooks provide extensive accounts of all of her activities in

weekly status reports, even though IRM generally required only concise summaries

of employees' work in status reports. R. 70-4 at 9. Also, IRM policy typically

excused project delays for reasonable explanations, but Mr. Hwang and Mr. Ngo

refused to relax a preliminary target date of October 1, 2006 for Ms. Brooks to

complete a project to automate MSPB's tracking of Freedom of Information Act

requests. *Id.* Ms. Brooks had good reasons for requesting an extension—she had

encountered technical issues, which she detailed to her supervisors, and the MSPB

clerk had an alternative plan in case the project had to be delayed. *Id.* Moreover,

she had received the assignment only after another employee failed to complete it.

*Id*.

### D. Ms. Brooks contacts MSPB's EEO Office and receives a "Minimally Successful" performance rating.

Because of the continued unfair treatment, on August 30, 2006, Ms. Brooks

contacted MSPB's EEO Director, Julio Matta. *Id.* Then, on October 31, she again

contacted Mr. Matta after Mr. Ngo accused her of falsifying her time sheet. R. 70-4 at 3-4, 14.

Between October 27 and 31, Mr. Ngo sent Ms. Brooks a series of emails alleging that she misreported her time by 30 to 40 minutes on October 25, although she had recently worked numerous extra hours. R. 70-4 at 3-4; R. 72-1 at 206:2-8. Mr. Ngo held up certification of IRM's time records because of the supposed 30- to 40-minute discrepancy, a departure from how supervisors usually handled minor time discrepancies. R. 72-1 at 206:7-8. And, although Mr. Hwang later claimed "[t]his was not a big deal," R. 61-3 at 2, Mr. Ngo's accusation amounted to an allegation of time fraud, which carries severe penalties, including possible removal for a first offense. R. 70-21 at 4.

Mr. Matta met with Ms. Brooks, Mr. Hwang, and Mr. Ngo on October 31. R. 70-4 at 3-4, 14. Although Mr. Ngo claimed "[w]e don't monitor people," R. 72-3 at 43:4, he indicated that he observed the exact minute when Ms. Brooks arrived on October 25. R. 61-6 at 2. He also said that, later that same day, he had another IRM employee check to see if Ms. Brooks was still in the office, determine what time she logged out of MSPB's email system, and report back to him. R. 61-6 at 2; R. 70-4 at 3-4.[3]

_____

[3] Ms. Brooks initially sacrificed 45 minutes of leave to resolve the issue, but Ms. Watkins (MSPB's Chief of Staff) later directed Mr. Ngo to restore the time. R. 61-3 at 2-3; R. 72-1 at 207:9-11.

On November 3, 2006, just a few days after the October 31 EEO meeting, Ms. Brooks was rated "Minimally Successful" on her 2006 performance evaluation. R. 70-27 at 1. It was the worst rating of her career, and the lowest rating given by Mr. Hwang and Mr. Ngo that year. R. 72-1 at 66:17-21; R. 72-5 at 188:10-20. As a result, Ms. Brooks was not awarded a bonus, although all the other GS-14 Team Leaders received bonuses of up to several thousand dollars. R. 70-23 at 1; R. 70-24 at 1; R. 70-25 at 1; R. 70-26 at 1; R. 70-27 at 1. She also lost eligibility for IRM's "working from home" and "alternative work schedule" programs. R. 70-9 at 2-3.

**E. Ms. Brooks files her first and second formal EEO complaints.**

On February 20, 2007, Ms. Brooks filed her first formal EEO complaint of discrimination and retaliation based on the 2006 evaluation and other incidents. R. 70-7 at 2; R. 70-8 at 2. Ms. Brooks received a "Fully Successful" rating in the fall of 2007, which was higher than her 2006 rating but still lower than her 2004 rating. R. 61-4 at 4; R. 72-1 at 66:17-21; R. 72-3 at 152:4-11. Then, on November 7, 2007, Ms. Brooks received an email from Mr. Hwang accusing her of failing to take "ownership" of her work because she had suggested that Mr. McDermott go to Mr. Thomas for a question relating to Mr. Thomas's work on a project (rather than assisting Mr. McDermott herself). R. 70-5 at 2.

The following week, on November 15, 2007, Mr. McDermott erupted at Ms. Brooks during a team meeting, R. 70-6 at 1-2, demanding to know why she had not answered a question he had asked her about MSPB's time and attendance system. *Id.* (She had in fact addressed the question the prior day by email. *Id.*) Mr. McDermott's outburst caused the room to fall silent, and Mr. Hwang and Mr. Ngo had to calm him down. *Id.*

After the meeting, Ms. Brooks expressed her concerns about Mr. McDermott's behavior in a private email to Mr. Hwang and MSPB's Human Resources and EEO Directors. *Id.* at 2, 4. (Later, in an affidavit, Mr. Hwang expressed his annoyance that Ms. Brooks "had already gone to EEO" about the incident "before I even had a chance to do anything." R. 70-39 at 2.) Although Ms. Brooks intended her email to be confidential, Mr. Hwang forwarded it to Mr. McDermott, who then forwarded it to *all* the meeting attendees, with antagonistic comments about Ms. Brooks. R. 61-7 at 2; R. 70-5 at 2-4; R. 70-6 at 4. However, in another email, Mr. Hwang dismissed the gravity of Mr. McDermott's actions by suggesting that *Ms. Brooks* was to blame because she failed to take "ownership." *See* R. 61-7 at 4.

In February 2008, Ms. Brooks filed her second formal EEO complaint, based on the November 2007 incidents and other events. R. 70-7 at 2; 70-8 at 2. On April 22, 2008, Ms. Brooks received a mid-year review, which identified no

10

significant concerns and praised her work on IRM's Outlook Calendar project. R. 70-31 at 14.

But then, on April 27 and 30, 2008, Mr. Ngo and Mr. Hwang completed affidavits responding to Ms. Brooks' second formal EEO complaint, in which they openly expressed disdain for her EEO activity. R. 70-38 at 3, 4-5; R. 70-39 at 2, 4-5. Mr. Ngo wrote, "This has been an on-going pattern with Ms. Brooks. Any comments or questions … she doesn't like, she tries to turn into an EEO issue." R. 70-38 at 5. He dismissed Ms. Brooks' complaints as "nothing new" and "not credible" and said he was "surprised she brought this up as an EEO issue." *Id*. at 3, 5. Similarly, Mr. Hwang wrote, "[she] go[es] to EEO first whenever she thinks there is a problem. R. 70-39 at 2. He stated further, "[w]hen she is appraised because of her performance and does not agree, Ms. Brooks claims it's because of discrimination" and complained that "[t]hese are some of the same issues she brought up in her earlier complaint. We've already gone through this." *Id.* at 4-5.

Just days later, on May 1, 2008, Mr. Hwang implemented a reorganization plan that isolated Ms. Brooks on a "team" by herself, with no employees to supervise, and assigned her low-level tasks below her capabilities as a GS-14. R. 70-8 at 2-4; R. 70-19. The new plan was a departure from Mr. Hwang's original reorganization plan, which he formulated in October 2007, to become effective April 1, 2008. R. 70-35 at 2. Before the reorganization, Ms. Brooks and Mr.

11

Thomas worked together on the E-Government Team, and Mr. McDermott and

Ms. Turner worked together on the Case Processing Systems Team. R. 72-4 at

133:14-135:2. The original reorganization plan assigned Ms. Brooks high-level

testing duties and placed her on a new Applications Team, supervising several

employees with Mr. McDermott, Mr. Thomas, and Ms. Turner. R. 70-8 at 3-4; R.

70-18, R. 70-19; 70-35 at 2.

Except for Ms. Brooks' isolation and diminished job duties, the May 2008

reorganization followed the original plan exactly. R. 70-18; R. 70-19. Mr. Hwang

and Mr. Ngo claimed the change was necessary because of Ms. Brooks' conflict

with Mr. McDermott and because Mr. Thomas and Mr. McDermott said Ms.

Brooks would "slow down" the Applications Team. R. 70-34 at 2. (However, other

co-workers described Ms. Brooks as a team player with "high level" technical

skills, which undermines the supervisors' explanation. R. 70-10 at 4; R. 70-11 at 3;

R. 72-2 at 91:6-95:10.) Ms. Brooks was told that the new assignment would be

permanent, and she believed her career was threatened. R. 70-7 at 4; R. 70-8 at 2-3.

### F.  Ms. Brooks files a third formal EEO complaint and receives an "Unacceptable" performance rating.

After Ms. Brooks filed her third formal EEO complaint on August 13, 2008,

Mr. Hwang and Mr. Ngo gave her a new work assignment. R. 70-7 at 3-4; R. 70-

36. But they did not restore Ms. Brooks to a team, and she continued to be the only

Team Leader without supervisory responsibilities, a situation that remains unchanged to the present day. R. 70-7 at 3-4; R. 70-19.

Ms. Brooks' third formal EEO complaint was investigated between September and November 2008. R. 70-33. On October 8 and October 9, 2008, Mr. Ngo and Mr. Hwang submitted EEO affidavits in response to Ms. Brooks' third formal complaint, in which Mr. Ngo again complained about her EEO activity and the fact that she had consulted a lawyer. R. 70-34 at 5; R. 70-35. Mr. Ngo's affidavit stated, "This is the third EEO complaint filed by Patricia Brooks. I don't expect [it] to be the last." R. 70-34 at 5.

Then, in November 2008, only a few months after Ms. Brooks' positive mid-year review, Mr. Hwang and Mr. Ngo gave Ms. Brooks an "Unacceptable" performance rating, R. 70-31, although Ms. Brooks believed her performance warranted "Exceeds Fully Successful," or at least "Fully Successful." R. 70-8 at 5. As a result of the "Unacceptable" rating, Ms. Brooks did not receive a bonus, although several GS-14 colleagues did. R. 70-8 at 8; R. 70-29 at 1.  In December 2008, she was placed on a Performance Improvement Plan, making her a candidate for termination. R. 61-10 at 1, 4.

## II. The atmosphere at IRM

The incidents described in Part I were part of a broader, ongoing pattern of adverse treatment perpetrated by Mr. Hwang and Mr. Ngo against Ms. Brooks. As

one of IRM's GS-13 employees observed, Mr. Hwang and Mr. Ngo treated "all Team Leader[s] . . . more favorably than [Ms. Brooks]." R. 70-9 at 3. At weekly meetings attended by all of the IRM Team Leaders, the supervisors treated Ms. Brooks harshly, demanding explanations for project delays, acting irritably toward her, and heavily criticizing her contributions to the meetings, but they did not treat her white and Asian male peers remotely the same way. R. 70-4 at 14; R. 70-9 at 3; R. 70-12 at 3; R. 70-38 at 2. Ms. Brooks' white and Asian male co-workers (especially the other Team Leaders) parroted the supervisors' treatment of her, and the supervisors tolerated, and even encouraged this conduct. *See* R. 70-5 at 3-4; R. 70-9 at 3. As one GS-13 employee at IRM put it, "[t]he male co-workers are aligned with management to get rid of [Ms. Brooks]." R. 70-11 at 3.

For example, Mr. Hwang and Mr. Ngo allowed the white and Asian male Team Leaders to join in the harsh treatment of Ms. Brooks at Team Leader meetings and tolerated Mr. Thomas's (white male) sarcastic emails about Ms. Brooks (including one suggesting that Ms. Brooks be transferred to an "MSPB in Alaska"). R. 70-9 at 3; R. 72-4 at 227:1-240:20, 249:1-256:3; R. 70-32. Mr. Hwang and Mr. Ngo also encouraged—and even solicited—private criticism about Ms. Brooks from her white and Asian male peers. *See, e.g.*, R. 70-32 at 2 (email from Mr. Ngo to Mr. Thomas encouraging Mr. Thomas to "speak[] up" about Ms. Brooks' work). Her 2008 "Unacceptable" performance review anonymously

14

quoted other Team Leaders' negative comments about Ms. Brooks and explicitly quoted Mr. McDermott's criticism of the Outlook Calendar project and his comment that she "wants credit for work done by others." R. 70-31 at 10. And, Mr. Ngo said he and Mr. Hwang took into account Mr. Thomas's and Mr. McDermott's opinion that Ms. Brooks would "slow down" the Applications Team. R. 70-34 at 2.

As noted above, in 2008, Mr. Hwang had isolated Ms. Brooks to a "team" by herself with no employees to supervise, R. 70-8 at 2-4; R. 70-19, and the supervisors also tolerated it when Ms. Brooks' co-workers excluded her. On a project to create a new MSPB intranet, Mr. Hoang required his staff to seek approval from Mr. Thomas before contacting Ms. Brooks, even though Mr. Thomas and Ms. Brooks were co-Team Leaders who had equal rank on the project. R. 70-4 at 6. (Mr. Hoang's policy also hindered Ms. Brooks' work by preventing her from obtaining help when Mr. Thomas was unavailable. *Id.* at 7 n.1.) Mr. Hoang also prohibited his staff from communicating with Ms. Jefferson—the only other African-American female Team Leader—without his prior approval. *Id.* at 6.

More generally, Mr. Hwang and Mr. Ngo fostered an environment where African-American women were treated differently than their white and Asian peers. *See* R. 70-9 at 3; R. 70-11 at 3-4; R. 70-12 at 3. For example, Mr. Hwang and Mr. Ngo tolerated Mr. McDermott's (white male) inappropriate behavior

15

MATERIAL UNDER SEAL DELETED

toward African-American women, including his outburst at Ms. Brooks at the

November 2007 meeting. R. 70-5 at 3, 5. Mr. McDermott clashed with two other

African-American women: Ms. Jefferson, and Veronica Bullock, an employee in

another MSPB section. R. 72-2 at 135:16-137:21; R. 72-5 at 199:14-200:22.

**III. Disparate treatment of Ms. Brooks**

Mr. Hwang and Mr. Ngo routinely treated Ms. Brooks worse than her white

and Asian male peers, and worse than employees who had not engaged in

protected activity. (She was the only IRM employee who filed a formal EEO

complaint between 2005 and 2008. R. 72-5 at 188:21-189:2.) As one co-worker put

it, Ms. Brooks "is being held to a higher standard. [She] is the only one who gets punished." R. 70-11 at 3.

Although not the only example of differential treatment, *see supra* at 11-12, 13-15, Ms. Brooks' 2006 and 2008 performance ratings make especially clear that she was "held to a higher standard," R. 70-11 at 3, than her white and Asian male peers who had not engaged in protected activity. Between 2005 and 2008, Ms. Brooks was the only IRM employee to receive a rating below "Fully Successful" or a Performance Improvement Plan. R. 72-5 at 187:10-188:17. Ms. Brooks' 2006 "Minimally Successful" evaluation and 2008 "Unacceptable" evaluation alleged problems with teamwork and communication, attendance, and performance. R. 70-27 at 9-10; R. 70-31 at 6-8. But although Ms. Brooks' Asian and white male counterparts who had not engaged in EEO activity—including Mr. Hoang, Mr. McDermott, and Mr. Thomas—exhibited similar or more serious problems in those areas, *see, e.g.*, R. 70-4 at 5-7, 13; R. 70-11 at 2; R. 70-12 at 3, they all received higher ratings than she did in 2006 and 2008. R. 72-5 at 187:13-188:20.

## A. Teamwork and communication

Ms. Brooks' 2006 and 2008 evaluations alleged that she had problems with teamwork and communication. R. 70-27 at 9-10; R. 70-31 at 8-10. By contrast, as Mr. Ngo acknowledged, the white and Asian male Team Leaders (Mr. Hoang, Mr.

McDermott, and Mr. Thomas) never had their performance ratings downgraded for communication issues. R. 72-3 at 165:11-166:6.

    In 2006, when Mr. Ngo met with Ms. Brooks to explain her evaluation, he identified only one example of poor teamwork and communication, a disagreement between Ms. Brooks and Elliot Hoang (Asian male, GS-14). R. 70-27 at 11. Mr. Hoang had refused to give Ms. Brooks access to a Microsoft technical support service that she needed for a project. R. 70-9 at 3. At the time, Mr. Ngo agreed with Ms. Brooks and told Mr. Hoang to cooperate with her, and he later reiterated in his deposition that Mr. Hoang was wrong to withhold access from the service. R. 70-4 at 5-6; R. 70-9 at 3; R. 72-3 at 161:9-17. In contrast to Ms. Brooks, Mr. Hoang received the highest rating ("Outstanding") in 2006. R. 70-24 at 1. His evaluation did not mention the disagreement and called him "a great team player." *Id.* at 10. But despite this glowing review, Mr. Ngo acknowledged in his deposition that he had personally experienced difficulties communicating with Mr. Hoang, and he agreed that Mr. Hoang had conflicts with other Team Leaders (including "bickering" with Mr. Thomas and "disagreements" with Mr. McDermott). R. 72-3 at 156:5-157:4, 224:12-224:22.

    On her 2008 performance evaluation, Ms. Brooks received an "Unacceptable" rating for "Teamwork," which covered "teamwork, communication, and interaction." R. 70-31 at 1, 4. As an example of *Ms. Brooks'*

18

poor communication, the evaluation cited a "loud" exchange with Mr. McDermott, that is, *Mr. McDermott's* verbal attack on Ms. Brooks at the November 2007 meeting. *Id.* at 9. But Mr. McDermott's 2008 evaluation did not even mention the November 2007 incident (although Mr. Hwang acknowledged in his deposition that Mr. McDermott's behavior was inappropriate). R. 70-29; R. 72-5 at 199:5-200:1.

Instead, Mr. McDermott received an "Exceeds Fully Successful" rating in "Teamwork" (and "Exceeds Fully Successful" overall) for 2008, and his evaluation stated that he "treats everyone fairly and interacts with them in a professional manner." R. 70-29 at 1, 4, 8. But this description is contradicted by Mr. McDermott's history of clashing with other employees, and Ms. Jefferson's characterization of Mr. McDermott as having the worst communication skills among the IRM Team Leaders (based on, for example, his practice of "yelling in the office, yelling in meetings, [and] overstepping boundaries"). R. 72-2 at 89:2-89:10, 100:11-102:8, 107:1-109:14; R. 72-3 at 170:19-21.

Ms. Brooks' 2008 review quoted other Team Leaders—several anonymously—on Ms. Brooks' alleged "inability to work cooperatively and effectively." R. 70-31 at 10. But although Ms. Jefferson was one of the Team Leaders cited, she stated in her deposition that she has never experienced any communication or teamwork issues with Ms. Brooks. R. 70-2 at 122:2-15, 138:9-

19

18. In fact, other co-workers agreed that Ms. Brooks is a team player and reported "no problem" working with her. R. 70-10 at 4; R. 70-11 at 3; R. 70-12 at 3. Mr. Ngo himself acknowledged that Ms. Brooks' written communications are professional and even outstanding. R. 72-3 at 194:13-195:3.

## B. Work time and attendance at Team Leader meetings

Mr. Hwang and Mr. Ngo downgraded Ms. Brooks' 2006 and 2008 ratings for missing or arriving late to weekly Team Leader meetings, R. 70-27 at 9; R. 70-31 at 8. In 2006, they claimed she missed two meetings, out of three to four dozen that year, R. 72-3 at 139:2-19; R. 70-27 at 9, but Mr. Ngo admitted that he did not keep records of meeting attendance in 2006. R. 72-3 at 143:22-144:2, 264:4-7. In 2008, Mr. Hwang and Mr. Ngo could not identify the dates of some allegedly missed meetings, and Ms. Brooks had reasonable explanations in other cases. R. 70-8 at 6. For one meeting (cited *twice* in the evaluation, R. 70-31 at 8, 12), she did not return after taking a restroom break near the end of the meeting because a paralegal requested her help in retrieving some critical reports. R. 70-8 at 7. In another case, she missed a meeting at which she was not scheduled to speak to assist a high priority customer with rescuing data that had become indecipherable. *Id.* at 6-7.

Mr. Ngo admitted in his deposition that other Team Leaders missed or arrived late to meetings, but he could not recall talking to anyone other than Ms.

20

Brooks about meeting attendance. R. 72-3 at 140:21-142:18; 145:15-146:3. Mr.

Ngo also acknowledged that other Team Leaders could send their GS-13

subordinates in their place to meetings, but Ms. Brooks had no subordinate GS-13

to send. *Id.* at 146:11-15.

In general, Mr. Hwang and Mr. Ngo have scrutinized Ms. Brooks'

attendance and, one IRM employee put it, "singled [her] out" for alleged

attendance problems. R. 70-11 at 2; *see supra* at 8 (discussing Mr. Ngo's scrutiny

of Ms. Brooks' time sheet and time-fraud accusation). By contrast, with other

employees, IRM was "very flexible," R. 72-3 at 43:3, and Mr. Hwang and Mr. Ngo

tolerated tardiness and absences by Ms. Brooks' co-workers. *See* R. 70-11 at 2; R.

70-12 at 3; R. 72-2 at 126:3-16; R. 72-3 at 262:4-17. In fact, both Mr. Hwang and

Mr. Ngo personally have used work time and office equipment for stock trading,

visits to online gambling sites, and (in Mr. Hwang's case) personal real estate

transactions involving a rental empire of more than twenty houses in several states.

*See* R. 72-3 at 43:14-45:18; R. 72-4 at 61:3-66:11.

## C. Alleged work delays and performance problems

Ms. Brooks' 2006 and 2008 ratings were also lowered for alleged work

delays and performance problems. Her 2006 rating cited a few missed or late

weekly status reports, R. 70-27 at 9-10, allegations she believed were

21

unsubstantiated and trivial. R. 70-4 at 5. Her 2008 evaluation also cited two missed

weekly activity reports out of the entire year. R. 70-31 at 8.

Ms. Brooks' 2008 evaluation cited project delays in justifying a "Minimally

Successful" rating for the Annual Work Plan Element, including delays in the LAN

Document Migration and Livelink macro projects, both of which Ms. Brooks

completed by the end of the year. *Id.* at 6-7. Her evaluation contrasted starkly with

Mr. Thomas's 2006 evaluation, which excused his failure to complete the

relocation of MSPB's public website during the fiscal year as planned and awarded

him an "Outstanding" rating for the Annual Work Plan Element (and

"Outstanding" overall). R. 70-23 at 1, 9. As another IRM employee observed, Mr.

McDermott, too, "has not been questioned" when his projects were incomplete. R.

70-12 at 3.

Ms. Brooks' 2008 evaluation also claimed problems with her work on the

Outlook Calendar project. R. 70-31 at 6-8. But Mr. Hwang and Mr. Ngo had

praised Ms. Brooks' work on the Outlook Calendar project in her April 2008 mid-

year review, noting "her good job in coming up with the office calendar solution."

R. 70-31 at 14. And, according to a co-worker, the Calendar project's deficiencies

stemmed from network limitations, not Ms. Brooks' performance. R. 70-10 at 1-2.

In contrast, none of Ms. Brooks' peers received an "Unacceptable" (or even

"Minimally Successful") rating despite project failures and delays. R. 70-4 at 13;

22

R. 72-2 at 131:6-133:19, 135:1-135:15; R. 72-5 at 187:13-188:20. In fact, as Ms.

Jefferson observed, "[Mr. McDermott] has had projects [including the Document

Management System upgrade] that went belly up and we didn't see anything []

done to him." R. 72:2 at 131:20-22. Ms. Jefferson also characterized Ms. Brooks'

technical skills, including programming and program management skills, as

superior to Mr. McDermott's. R. 72-2 at 90:21-94:10.

**IV. Effects on Ms. Brooks' health and well-being**

Mr. Hwang's and Mr. Ngo's conduct has caused Ms. Brooks to suffer

emotional distress and stress-related physical effects, including an infection of the

Bartholin's gland (which is often associated with stress), weight gain, and

worsened hypertension. R. 70-4 at 15. Due to MSPB's conduct, Ms. Brooks often

felt tense and nervous at work and afraid of making mistakes. *Id.* at 14. She was

afraid to take leave and sometimes came to work despite feeling ill. *Id.*

**V. Proceedings and decision below**

On January 17, 2008, Ms. Brooks filed this Title VII suit, alleging

discrimination based on race, sex, and retaliation by MSPB. R. 1. Ms. Brooks filed

her Second Amended Complaint on February 11, 2009. R. 28. On February 3,

2011, MSPB moved for judgment on the pleadings, or, alternatively, for summary

judgment. R. 61. On March 29, 2012, the district court granted summary judgment

to MSPB and dismissed the case with prejudice. R. 82.

23

The district court concluded that Ms. Brooks did not raise a genuine issue of material fact as to her hostile-work-environment claim. R. 82 at 12-13. The court held that the incidents of harassment were "isolated" and "not sufficiently severe," and dismissed some events as "work-related actions by supervisors." *Id.* at 11. The district court did not consider Ms. Brooks' discrete retaliation claim on the rationale that Ms. Brooks' Second Amended Complaint "frames each of its three counts in terms of a hostile work environment," and that her opposition to summary judgment "reaffirms that theory of the case." *Id.* at 9 n. 6. For the reasons explained below, none of these rationales accurately reflects the factual record or the relevant legal principles. The district court's decision should therefore be reversed and the case remanded for trial.

## SUMMARY OF ARGUMENT

A hostile work environment consists of a series of harms that have the "cumulative effect" of altering the terms and conditions of employment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Here, the district court failed to consider the "totality of the circumstances," *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008), in granting summary judgment to MSPB on Ms. Brooks' hostile-work-environment claim. In listing the events purportedly comprising the hostile work environment, the court did not even include several

24

key incidents. R. 82 at 11. And, it mischaracterized some events and improperly discounted others as "isolated" or "work-related." *Id.*

In fact, the record shows that Ms. Brooks' supervisors and co-workers subjected her to a constant onslaught of harsh treatment and ostracism, punctuated by several more serious incidents. Her supervisors "tried to get rid of " her, as one IRM employee put it, R. 70-11 at 3, by accusing her of time fraud, by giving her the lowest performance ratings of her career, and by isolating her on a "team" by herself. Mr. Hwang, the director of IRM, physically threatened Ms. Brooks in front of her co-workers, and his outburst was followed by a regular pattern of criticism at weekly meetings and a co-worker's verbal attack on Ms. Brooks. Ms. Brooks' supervisors frequently bullied and humiliated her in front of her peers, and they tolerated—and even encouraged—the same conduct by certain co-workers. A reasonable jury could easily conclude that the toxic environment at IRM amounted to severe and pervasive harassment.

There is also ample evidence indicating that the hostile work environment was based on race, sex, and retaliation. Mr. Hwang and Mr. Ngo fostered a discriminatory atmosphere at IRM, favoring white and Asian males over African-American women. Ms. Brooks' supervisors also held Ms. Brooks to a higher standard and disciplined her more harshly than her white and Asian male peers. In particular, they significantly downgraded her performance ratings for incidents

25

involving her co-workers, but then gave the same co-workers strong ratings. Ms. Brooks was the only IRM employee who filed a formal EEO complaint during the relevant period. Mr. Hwang and Mr. Ngo openly expressed disdain for her EEO reports and exacted a series of punishments each time she engaged in protected activity.

The district court should have considered Ms. Brooks' claim of discrete retaliation. The evidence shows that MSPB perpetrated materially adverse actions—the poor performance reviews accompanied by lost bonuses and the reorganization of IRM—close on the heels of Ms. Brooks' protected activity. Ms. Brooks' Second Amended Complaint adequately pleads a discrete retaliation claim, and her summary-judgment opposition articulates the legal standards for such a claim. Therefore, the district court erred in failing to review this claim on its merits.

## ARGUMENT

### I. Standard of review

This Court reviews the district court's grant of summary judgment *de novo*. *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008). A grant of summary judgment is warranted only if there is no genuine dispute of any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Steele*, 535 F.3d at 692.

"A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006) (internal quotation marks and citation omitted). The court must review the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).

## II. A reasonable jury could find for Ms. Brooks on her hostile-work-environment claim.

Ms. Brooks presented ample evidence supporting her claim that MSPB's discriminatory and retaliatory actions created a hostile work environment. In rejecting her claim, the district court failed to appropriately analyze, and, in some cases, ignored, relevant facts. Hostile-work-environment claims require a fact-intensive analysis, *see Barbour v. Browner*, 181 F.3d 1342, 1348 (D.C. Cir. 1999); *see also Curry v. Dist. of Columbia*, 195 F.3d 654 (D.C. Cir. 1999) (Wald, J., concurring) (hostile work environment "is an intensely fact-based question"); *Beardsley v. Webb*, 30 F.3d 524, 529-30 (4th Cir. 1994) (hostile work environment "is quintessentially a question of fact"), which often makes them inappropriate for summary judgment.[4]

---

[4] *See also Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 958 (10th Cir. 2012) (hostile work environment is "quintessentially a question of fact") (citation omitted); *Vera v. McHugh*, 622 F.3d 17, 26 (1st Cir. 2010) ("It is the jury's job to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment.") (internal quotation marks and citation omitted); *Betts v. Costco*

**A. The district court ignored or inappropriately discounted relevant facts that support a hostile-work-environment claim.**

A hostile work environment must be "objectively" and "subjectively" "severe or pervasive" so that it "alter[s] the conditions of the victim's employment and create[s] an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To make this assessment, courts must consider "the totality of the circumstances," *Baloch* , 550 F.3d at 1201, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Here, the district court failed to consider the totality of the circumstances. It neglected to evaluate all of the relevant facts, including many that the parties dispute. As to facts that the court did consider, the court mischaracterized certain incidents and incorrectly discounted others as "isolated incidents" or "work-related actions by supervisors" that purportedly would not support a hostile work environment. R. 82 at 11. These errors prevented the district court from fully assessing the "collective[]" and "cumulative effect" of the harassment. *Morgan*, 536 U.S. at 115, 117.

---

*Wholesale Corp.*, 558 F.3d 461, 468 (6th Cir. 2009) (hostile work environment is "quintessentially a question of fact") (citation omitted); *Howard v. Burns Bros.*, 149 F.3d 835, 840 (8th Cir. 1998) ("[W]hether conduct [rises] to the level of abuse is largely in the hands of the jury") (citation omitted).

28

The district court's summary of incidents comprising the hostile work environment was incomplete, listing only the May 2005 and November 2007 meetings, Ms. Brooks' "four month[]" isolation after the May 2008 reorganization, negative performance reviews, and "smaller instances of allegedly disrespectful behavior that are not recited above." R. 82 at 11. The district court ignored several important incidents, including the October 2006 accusation of time fraud and Mr. Ngo's monitoring of Ms. Brooks' arrival at work, her lost bonuses in 2006 and 2008, her 2008 Performance Improvement Plan, and Ms. Brooks' effective demotion resulting from the May 2008 reorganization. Each of these incidents is "evidence of tangible workplace consequences" of a "financial" and "professional" nature, *see Baloch*, 550 F.3d at 1201, and should have been considered.

Moreover, contrary to the requirement that a hostile work environment be considered as a whole, *see Harris*, 510 U.S. at 23, the court discounted "smaller instances of allegedly disrespectful behavior not recited above." R. 82 at 11. But far from being irrelevant, these "smaller instances" demonstrate the pervasiveness of the harassment and show that the more serious incidents are linked together by a constant barrage of inappropriate conduct. The "smaller instances" include the pattern of criticism at meetings, disparately harsh scrutiny of Ms. Brooks' work performance, and tolerance of disrespectful treatment by male colleagues, as discussed above (at 13-15).

29

The district court also erred in assessing the facts it actually considered. For example, the court mischaracterized Ms. Brooks' isolation after the May 2008 reorganization as lasting only four months. R. 82 at 11. In fact, she remains isolated to this day, as the only Team Leader without a team or supervisory responsibilities. Also, the court said that the May 2005 and November 2007 meetings where "voices were raised" at Ms. Brooks were "isolated incidents." R. 82 at 11. But Mr. Hwang's and Mr. McDermott's outbursts in 2005 and 2007 were not isolated; instead, as explained above (at 13-15), they were part of a broader pattern of ongoing adverse treatment that Ms. Brooks' supervisors perpetuated over several years. *See Vickers v. Powell*, 493 F.3d 186, 197, 199 (D.C. Cir. 2007) (incidents separated by several years and involving two different people could be part of the same hostile work environment).

The district court dismissed the significance of Ms. Brooks' reassignment to responsibilities beneath her qualifications, her negative employment evaluations, and her isolation, saying that "courts have generally rejected hostile work environment claims that are based on work-related actions by supervisors." R. 82 at 11. Here, the court misstated the law. Discrete acts of discrimination or retaliation often take the form of "work-related actions by supervisors," and these acts can contribute to a hostile work environment. *See Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011). In fact, this Court has overturned summary judgment

30

where hostile-work-environment allegations included similar "work-related actions." *See, e.g.*, *Vickers*, 493 F.3d at 198-99 (negative performance evaluations and inquiry into an employee's use of sick leave); *Singletary v. Dist. of Columbia*, 351 F.3d 519, 526, 528 (D.C. Cir. 2003) (reassignment of tasks and work space and failure to provide employee with job description and training).

**B. A reasonable jury could conclude that MSPB's harassment unreasonably interfered with Ms. Brooks' work performance by creating a hostile work environment.**

Considering the totality of the circumstances, Ms. Brooks made out a triable hostile-work-environment claim. Although "no single factor is required," *Harris*, 510 U.S. at 23, Ms. Brooks adduced evidence establishing that MSPB's harassment was "frequen[t]," "sever[e]," and "physically threatening or humiliating," and that it "unreasonably interfere[d] with [her] work performance." *Id.* at 21.

**1. Frequency**

The harassment Ms. Brooks suffered was frequent—not "isolated." R. 82 at 11. As explained above (at 13-15), in addition to the most serious individual incidents, including the outbursts at two meetings, the time-fraud accusations, the performance ratings and lost bonuses, and the Performance Improvement Plan, Ms. Brooks' supervisors subjected her to a consistent pattern of hostile treatment over several years. They harshly criticized her at weekly meetings and allowed her co-

31

workers to do the same. *See, e.g.*, R. 70-4 at 3-12; R. 70-9 at 3; 70-11 at 3. Her

supervisors also frequently disparaged her work, scrutinized her attendance and

timeliness, isolated her from co-workers, and tolerated co-workers' disrespectful

behavior toward her. The constant harassment was apparent to other IRM

employees, who observed that Ms. Brooks was treated more harshly than her peers.

*See, e.g.*, R. 70-9 at 3; 70-11 at 3; *see also Gowski v. Peake*, 682 F.3d 1299, 1313

(11th Cir. 2012) (pattern of frequent harassment by supervisors was visible to other

staff in the victims' day-to-day work).

### 2. Severity

Ms. Brooks suffered severe harassment. Her supervisors subjected her to an

ongoing threat of termination and both her supervisors and co-workers bullied her.

As detailed above (at 23), the harassment was severe enough to affect Ms. Brooks'

health significantly, causing emotional and physical effects including anxiety,

worsened hypertension, stress-induced weight gain, and an infection. R. 70-4 at 14-

15.

As one co-worker observed, R. 70-11 at 3, Mr. Hwang and Mr. Ngo engaged

in a campaign to "get rid of [Ms. Brooks]." *See Gowski*, 682 F.3d at 1314

(supervisors' "campaign to force [employees] to resign" contributed to a hostile

work environment). Her supervisors first threatened Ms. Brooks with termination

by leveling an unfounded accusation of time fraud, a serious infraction that may

32

warrant removal even for first-time offenders. R. 70-4 at 3-4; R. 70-21 at 4. *See*

*Noviello v. City of Boston,* 398 F.3d 76, 93 (1st Cir. 2005) ("[F]alse accusations of

misconduct can contribute to the creation of a hostile work environment."). Ms.

Brooks' supervisors took further steps toward "get[ting] rid of" her, R. 70-11 at 3,

by giving her the worst performance ratings of her career in 2006 and 2008,

although her performance was better than or comparable to her co-workers'

performances. R. 70-4 at 6, 13; R. 70-27; R. 70-31. The "Unacceptable" 2008

rating was accompanied by a Performance Improvement Plan, which made Ms.

Brooks a candidate for termination. R. 61-10.

Ms. Brooks' poor performance ratings resulted in "tangible workplace

consequences" of a "financial" and "professional" nature. *See Baloch*, 550 F.3d at

1201. The low ratings harmed Ms. Brooks' reputation among her peers, damaged

Ms. Brooks' chances of successfully pursuing other opportunities within MSPB

and the federal government, and cost her substantial bonuses. *See, e.g.*, R. 70-8 at

8; R.70-23 at 1; R. 70-24 at 1; R. 70-25 at 1; R. 70-26 at 1; R. 70-27 at 1; *see also*

*Gowski*, 682 F.3d at 1313-14 (citing efforts to damage an employee's reputation as

part of a hostile work environment).

The conduct of Ms. Brooks' supervisors and co-workers can reasonably be

characterized as bullying, a very serious matter in the workplace. Mr. Hwang set

the tone with his outburst and physically threatening behavior at the May 2005

meeting. *See, e.g.*, R. 70-4 at 2. Mr. McDermott's verbal attack and hostile email in November 2007 is only one additional incident. *See, e.g.*, R. 70-5 at 3-4. Ms. Brooks' supervisors and co-workers used the weekly team meetings as an ongoing opportunity for further bullying, regularly leveling harsh criticism meant to belittle her and set her apart from the other Team Leaders. *See supra* at 13-15.

### 3. Humiliation

The harassment was humiliating and, at times, physically threatening. Mr. Hwang's physically intimidating conduct in May 2005—yelling at Ms. Brooks, slamming his hand on the table, and throwing a notebook at her—was so distressing that Ms. Brooks left the room and immediately reported the incident. *See, e.g.*, R. 70-4 at 2. This early incident reasonably colored Ms. Brooks' subsequent perception of her supervisors' and co-workers' conduct. Whether harassment is objectively humiliating or threatening is assessed from the perspective of a reasonable person in the plaintiff's position. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995). Subsequent incidents of harassment would be "even more" acute to a person in Ms. Brooks' position, who has already "endured" hostile treatment. *Dey v. Colt Constr.,* 28 F.3d 1446, 1456 (7th Cir. 1994). Therefore, the repeated criticism and ostracism Ms. Brooks experienced during team meetings, described above (at 13-15), should be assessed from the

perspective of a person who previously experienced her supervisor's humiliating and threatening outburst in front of her co-workers.

This same principle also applies to her co-workers' conduct. For example, a reasonable jury could find that the November 2007 episode, when Mr. McDermott erupted at Ms. Brooks during a team meeting, Mr. Hwang forwarded Ms. Brooks' private email about the incident to Mr. McDermott himself, and Mr. McDermott subsequently sent an antagonistic email to all of the IRM Team Leaders, would be especially humiliating to Ms. Brooks. *See, e.g.*, R. 70-5 at 3-4.

Similarly, a reasonable jury could easily find that the accusation of time fraud was designed to humiliate. Mr. Ngo held up time certification for IRM because of an alleged 30- to 40-minute discrepancy on Ms. Brooks' timesheet. R. 70-4 at 3-4; R. 72-1 at 205:18-206:17. The same is true for the May 2008 reorganization, in which Mr. Hwang and Mr. Ngo took away Ms. Brooks' opportunity to supervise staff and work on a team and assigned her low-level tasks. R. 70-8 at 2-4. The supervisors claimed to base this decision on Mr. McDermott's and Mr. Thomas's belief that she would "slow down" the Applications Team, R. 70-34 at 2, and their reliance on co-workers' criticism could be seen as humiliating on its own.

**4. Interference with Ms. Brooks' work performance**

The harassment unreasonably interfered with Ms. Brooks' work performance by, among other things, isolating her from her co-workers, requiring her to meet higher standards than her peers, and damaging her professional reputation. Her resulting health problems "underscore[] the negative effect on her work performance." *Noviello*, 398 F.3d at 94.

The most serious example of Ms. Brooks' isolation was her placement on a "team" by herself in the May 2008 reorganization, which left her without supervisees or team members. R. 70-8 at 2-4. But Mr. Hwang's and Mr. Ngo's efforts to isolate her began much earlier. For example, their public harsh treatment of Ms. Brooks at IRM meetings ostracized her from her peers—and encouraged her co-workers to join in. The supervisors solicited criticism of Ms. Brooks' work from other Team Leaders and tolerated their refusal to cooperate with her. R. 70-4 at 6; 70-31 at 10; 70-32 at 2; 70-35 at 2. Her isolation has therefore undermined her ability to interact with other IRM staff, hindering her job performance. *See Gowski*, 682 F.3d at 1314 (reassignment and removal from committees and projects); *Noviello,* 398 F.3d at 93 ("exclusion[] [and] denial of support") (internal citations omitted); *Singletary*, 351 F.3d at 528 (reassignment of tasks and work space).

Ms. Brooks' supervisors' demands that she meet higher standards than her peers similarly interfered with her work performance. This pattern is clear from,

36

among other things, Ms. Brooks' poor 2006 and 2008 performance ratings, which her supervisors lowered for incidents involving other Team Leaders (while her peers received strong ratings), her supervisors' unusually intense scrutiny of her attendance (in an otherwise "very flexible" environment), and harsh criticism at meetings. *See, e.g. supra* at 8, 13-15, 17-23; R. 70-4 at 3-4; R. 70-27; R. 70-31; R. 72-3 at 43:3. As a result, Ms. Brooks felt tense and nervous at work, afraid of taking leave, and afraid of making mistakes. R. 70-4 at 14. A reasonable jury could easily find that Ms. Brooks' fear of being penalized for minor mistakes would affect her work performance by causing her, for example, to spend additional time and energy on her assignments.

Ms. Brooks' poor performance evaluations in 2006 and 2008 also harmed her long-standing reputation as a highly qualified and productive federal employee, adversely affecting her ability to pursue new opportunities at MSPB and other agencies. It is well-settled that damage to an employee's reputation (including damages stemming from low performance evaluation ratings) may contribute to a hostile work environment. *See Gowski*, 682 F.3d at 1313-14 (damage to employees' reputations, discipline of employees, and low proficiency ratings); *Vickers*, 493 F.3d at 198-99 (negative performance evaluations).

* * * * *

37

In sum, a reasonable jury could conclude that Ms. Brooks' supervisors and co-workers subjected her to harassment that was frequent, severe, and humiliating, all of which interfered with her work performance.

### C. A reasonable jury could conclude that MSPB's harassment was based on race, sex, and retaliation.

The district court did not consider the bases for Ms. Brooks' harassment. R. 82 at 12 n.7. In fact, the record contains ample evidence that it was based on race, sex, and retaliation. A reasonable jury could easily conclude that Ms. Brooks' supervisors initiated the pattern of hostile treatment based on race and sex and then escalated the pattern in retaliation for her protected activity.

### 1. The harassment was based on race and sex discrimination.

A reasonable jury could determine that MSPB's conduct was based on Ms. Brooks' race and sex. Discrimination can be inferred from evidence that an employee "was treated differently from similarly situated employees who are not part of the protected class," *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006), or that an employer's stated nondiscriminatory reasons for its actions were false, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).

The record demonstrates a double standard at MPSB. In contrast to their treatment of Ms. Brooks, Mr. Hwang and Mr. Ngo excused project delays for white and Asian male employees, did not scrutinize their attendance, did not

reprimand them for disrespectful treatment of Ms. Brooks, and did not lower their

performance reviews for the *very same incidents* cited as justification for lowering

Ms. Brooks' performance reviews. *See supra* at 18-19. Other evidence also

supports an inference of discriminatory animus toward African-American women.

Mr. Thomas (white male) was hired as a GS-14 soon after Mr. Ngo questioned Ms.

Brooks' GS-14 status and said there were too many GS-14s. R. 72-1 at 88:11-

89:23, 90:5-15; R. 72-4 at 136:8-11. The supervisors proposed excluding all of the

female Team Leaders from meetings. R. 72-1 at 175:18-176:2.


Ms. Brooks received poor performance ratings of "Minimally Successful" in

2006 and "Unacceptable" in 2008, but, as explained above (at 17-23), evidence

shows that the ratings were unjustified, and that her white and Asian male

counterparts were not downgraded for similar conduct. This evidence raises serious

questions about the validity of the negative assessments. In other words, "there is

something 'fishy' about the facts of the case . . . that raises an inference of

discrimination." *Mastro,* 447 F.3d at 851 (quoting *Harding v. Gray*, 9 F.3d 150,

153 (D.C. Cir. 1993)). A reasonable jury could conclude that Mr. Hwang and Mr.

Ngo perpetuated the stereotype that white and Asian males are more suited for

IRM's information technology work than African-American women. In sum, there

39

is sufficient evidence to conclude that MSPB's harassment was based on racial and sexual animus.

### 2. MSPB engaged in a pattern of retaliation against Ms. Brooks.

The record also establishes a retaliatory pattern connecting Ms. Brooks' protected EEO activity and MSPB's harassment. The close temporal proximity between Ms. Brooks' protected activities and MSPB's reprisals supports an inference of retaliation. *Singletary*, 351 F.3d at 525. Evidence discrediting MSPB's explanations for Ms. Brooks' poor performance evaluations also supports an inference of retaliatory motivation. *Jones v. Bernanke*, 557 F.3d 670, 680-81 (D.C. Cir. 2009).

Mr. Hwang and Mr. Ngo regularly instigated reprisals shortly after protected activity. After the May 2005 meeting, Ms. Brooks reported Mr. Hwang's behavior to his supervisors, Mr. McPhie (the MSPB Chairman) and Ms. Watkins (Mr. McPhie's Chief of Staff). R. 70-4 at 2. Her reports followed the first steps in MSPB's EEO process, *see supra* note 2, and constituted protected Title VII activity. *See, e.g., Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (contact with senior agency personnel was protected activity). Immediately after Ms. Brooks' reports, Mr. Hwang bombarded her with harassing emails. R. 70-4 at 2, 8-9. Ms. Brooks again contacted MSPB's EEO office in August 2006. R. 70-4 at 3.

Only two months later, in October 2006, Mr. Ngo accused her of time fraud. R. 70-4 at 3-4.

On October 31, 2006, Ms. Brooks contacted the EEO office regarding the time-fraud accusation. R. 70-4 at 3-4. Only three days later, she received a "Minimally Successful" rating, her lowest ever. R. 70-27. The low rating was based on unsubstantiated and trivial allegations, and Ms. Brooks' white and Asian male counterparts who had not filed EEO complaints did not receive downgraded ratings despite similar conduct. *See supra at* 17-23.

In November 2007, Ms. Brooks contacted the EEO office after Mr. McDermott's outburst at a team meeting. R. 70-6 at 2. She sent an email about the incident to Mr. Hwang and copied the Acting EEO Director, and told Mr. Hwang in person that she had consulted with the EEO office. R. 70-6 at 2. Mr. Hwang expressed annoyance about her report to the EEO office. R. 70-39 at 2 ("[She] had already gone to EEO before I even had a chance to do anything."). In reprisal, he forwarded Ms. Brooks' confidential email to Mr. McDermott himself, which prompted Mr. McDermott's antagonistic email about Ms. Brooks to all of the meeting attendees. R. 61-7 at 2, 4.

In January 2008, Ms. Brooks filed this lawsuit, and, in February 2008, she filed her second formal EEO complaint. In late April 2008, Mr. Hwang and Mr. Ngo completed EEO affidavits expressing disdain for Ms. Brooks' EEO activity.

41

(Mr. Ngo wrote, "This has been an on-going pattern with Ms. Brooks. Any comments or questions . . . she doesn't like, she tries to turn into an EEO issue." R. 70-38 at 5. And Mr. Hwang wrote, "[She] go[es] to EEO first whenever she thinks there is a problem." R. 70-39 at 2.) Only a few days later, on May 1, Mr. Hwang reorganized IRM. R. 70-8 at 2-4; R. 70-19. Under the reorganization, contrary to the original plan, Ms. Brooks—and only Ms. Brooks—was isolated and effectively demoted. R. 70-8 at 2-4; R. 70-18; R. 70-19. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 58, 71 (2006) (reassignment shortly after protected activity could be retaliatory); *Gowski*, 682 F.3d at 1314.

Ms. Brooks' third EEO complaint was filed and investigated between September and November 2008. R. 70-33. In October 2008, Mr. Hwang and Mr. Ngo completed EEO affidavits, and Mr. Ngo wrote, "This is the third EEO complaint filed by Patricia Brooks. I don't expect [it] to be the last." R. 70-34 at 5; R. 70-35. In November, on her first regularly scheduled performance review after she filed her third EEO complaint, Ms. Brooks received an "Unacceptable" rating, and she was placed on a Performance Improvement Plan in December. R. 61-10; R. 70-31. The evidence shows that her poor rating and the Performance Improvement Plan were unjustified. *See supra* at 17-23; *see also Jones*, 557 F.3d at 680. Based on MSPB's pattern of retaliation, a reasonable jury could easily conclude that Ms. Brooks was subjected to a retaliatory hostile work environment.

### III. Ms. Brooks' claim that MSPB perpetrated discrete acts of retaliation should have been addressed by the district court and now should proceed to trial.

The district court erred in failing to address Ms. Brooks' claim for discrete acts of retaliation. As a result, this Court should conduct summary-judgment review of this claim *de novo*. Because this claim raises genuine disputes of material facts, it should proceed to trial.

### A. The district court erred in failing to consider whether Ms. Brooks maintained a retaliation claim.

The district court did not consider whether MSPB committed discrete acts of retaliation against Ms. Brooks. Instead, the court concluded that "[Ms.] Brooks does not assert that she has suffered a . . . retaliatory adverse employment action." R. 82 at 9 n.6. Therefore, the district court said that it "need not and does not consider whether any of the incidents described above might satisfy that element of a prima facie case." *Id.* at 5 n.6. The court justified its decision not to consider discrete acts of retaliation on the rationale that "[t]he complaint frames each of its three counts in terms of a hostile work environment, and both plaintiff's memorandum in opposition to [summary judgment] and her sur-reply . . . reaffirm that theory of the case." *Id.*

The district court erred in this regard. In fact, at every stage of her dispute with MSPB, Ms. Brooks has accused MSPB of retaliation and has factually supported those accusations with evidence in the record, including evidence of

43

adverse employment actions. Both the Second Amended Complaint and Ms.

Brooks' opposition to summary judgment support this conclusion.

### 1. Second Amended Complaint

Rule 8 requires only "a short and plain statement of the claim showing that

the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that the defendant be

given "fair notice of what the . . . claim is and the grounds upon which it rests."

*See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 545 (2007)). To be sure, the paragraphs of the Second Amended

Complaint that the district court cited (¶¶ 79-81) do not refer to "discrete acts" of

retaliation, but "[n]o technical form is required" under Rule 8. Fed. R. Civ. P.

8(d)(1).

Ms. Brooks' Second Amended Complaint was more than adequate to

"show[] that [Ms. Brooks] was entitled to relief" on her discrete retaliation claim. It

alleged "unlawful . . . retaliation" from the very first paragraph. R. 28 ¶ 1; *see alo*

*id.* at ¶ 13 ("Ms Brooks was discriminated against . . . in retaliation for her EEO

activity as set forth below."); ¶ 81 (alleging retaliation and mentioning pretext).

Although not required under Rule 8, Ms. Brooks also pled details about the

retaliation, including examples of materially adverse actions: her 2006 "Minimally

Successful" performance review, *see id.* ¶¶ 36-42, which "prevented Ms. Brooks

from receiving . . . a monetary bonus," *id.* ¶ 63; the May 2008 reorganization,

44

which isolated and effectively demoted Ms. Brooks, *id*. ¶¶ 70-74; and her 2008

"Unacceptable" performance review and PIP, *id.* ¶ 78. She also pled facts

indicating a causal connection between her protected activity and these events. *Id.*

¶ 64 ("[The] 2006 performance rating . . . followed her complaints to the MSPB

chairman and the EEO Director."); *id.* ¶ 70 ("The reorganization occurred after Ms.

Brooks formally filed a second EEO complaint."); *id.* ¶¶ 77-78 (explaining that

Ms. Brooks received her 2008 rating about four months after filing an EEO

complaint).

In the Title VII context, "labels . . . are not controlling for purposes of

establishing employer liability . . . [the plaintiff] should have an adequate

opportunity to prove she has a claim for which [the employer] is liable."

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 749, 765-66 (1998) (holding that

an employee should be allowed an opportunity to demonstrate *quid pro quo*

harassment although she "framed [her claim] as a hostile work environment

complaint"); *see also Steele*, 535 F.3d at 694 (finding that a complaint alleging

"discrimination" included a hostile-work-environment theory). Therefore, Title VII

plaintiffs are not required to "segregate those events [they] claim[] constitute a

hostile work environment from discrete acts of discrimination and/or retaliation."

*Baird*, 662 F.3d at 1252-53. Because Ms. Brooks adequately pled a theory of Title

VII retaliation and repeatedly supported a discrete-acts theory, the district court erred in declining to address that theory on the merits.

### 2. Summary-Judgment Opposition

The district court further justified its decision not to consider discrete acts of retaliation on the rationale that "plaintiff's memorandum in opposition to [summary judgment] and her sur-reply . . . reaffirm [the hostile work environment] theory of the case." R. 82 at 9 n.6. In support, the district court cited Ms. Brooks' Memorandum in Opposition to Summary Judgment, R. 70-1 at 26-27, 38, and Surreply, R. 76-1 at 1-2, 8. The cited pages of the Opposition and Surreply do discuss Ms. Brooks' hostile-work-environment claims, but the district court ignored other parts of Ms. Brooks' Opposition. (The Surreply responded to a new legal argument MSPB raised in its Reply. R. 76 at 1.)

Section V of Ms. Brooks' Opposition, titled "Defendant Retaliated Against Ms. Brooks for Complaining to MSPB Management and the EEO Director and for Making EEO Complaints," opens by articulating the prima facie test for retaliation and the burden-shifting framework under *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See* R. 70-1 at 31-32. Section V also states the test for a materially adverse action in the retaliation context. R. 70-1 at 32 (citing *White*, 548 U.S. at 68); *see also* R.70-1 at 33-34 (listing materially adverse actions including issuing "Minimally Successful" and "Unacceptable" performance ratings and the

46

May 2008 reorganization). The prima facie case and burden-shifting framework are part of a discrete retaliation claim, not a hostile-work-environment claim. *Compare Harris*, 510 U.S. at 21 (a hostile work environment is sufficiently "severe or pervasive" to "alter the conditions of the victim's employment") *with Holcomb*, 433 F.3d at 901-03 (stating the elements of a prima facie case of retaliation and the *McDonnell Douglas* framework). Therefore, although Section V argues the hostile-work-environment claim, it should also be read to oppose summary judgment on her discrete claim of retaliation. Because Ms. Brooks' claim of discrete acts of retaliation passes procedural muster and was not conceded, it should be reviewed by this Court *de novo*.[5]

### B. A reasonable jury could rule for Ms. Brooks on her discrete retaliation claim.

Under the *McDonnell-Douglas* burden-shifting framework, a plaintiff must first demonstrate a prima facie case to avoid summary judgment on a retaliation

---

[5] Ms. Brooks acknowledges that her Opposition may be read to disown a discrete retaliation claim. But, at the time she filed her Opposition (on June 17, 2011), there was confusion as to whether a hostile-work-environment claim could even encompass discrete acts. *See, e.g., Baird v. Snowbarger*, 744 F. Supp. 2d 279, 295 (D.D.C. 2010) ("[P]laintiff cannot rely on the discrete acts upon which she bases her discrimination and retaliation claims to support her hostile work environment claim."), *rev'd*, *Baird v. Gotbaum*, 662 F.3d 1246 (D.C. Cir. 2011); *Franklin v. Potter*, 600 F. Supp. 2d 38, 76 (D.D.C. 2009) (same); *Smith v. Jackson*, 539 F. Supp. 2d 116, 138 (D.D.C. 2008); *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2005). In December 2011, this Court made clear that a hostile work environment may "contain[] discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own." *Baird*, 662 F.3d at 1252.

47

claim. *Holcomb*, 433 F.3d at 901. The burden then shifts back to the plaintiff, who

must show that the employer's asserted reason is pretextual. *Id.* Here, Ms. Brooks

demonstrated a prima facie case of retaliation by providing evidence that (1) she

engaged in activity protected by Title VII; (2) MSPB took materially adverse

employment action against her; and (3) the adverse action was causally related to

the protected activity. *Id* at 901-2.

    Ms. Brooks engaged in protected activity on several occasions. Her first

protected activity occurred in May 2005, when she contacted Mr. McPhie and Ms.

Watkins, as contemplated by MSPB's EEO process. R. 70-4 at 2; *see Holcomb*,

433 F.3d at 903 (contact with senior agency personnel was protected activity). She

subsequently contacted MSPB's EEO office on several occasions and eventually

filed formal complaints of discrimination and retaliation—and this lawsuit. *See*

*supra* at 7-10, 12 (discussing Ms. Brooks' protected activity).

    Ms. Brooks also showed that MSPB took adverse actions against her. For a

retaliation claim, "[a]dverse employment actions are not confined to hirings,

firings, [or] promotions." *Id.* at 902. Instead, they encompass anything that "could

well dissuade a reasonable worker from making or supporting a charge of

discrimination." *White*, 548 U.S. at 57. "The threshold [for an adverse action] is

met when an employee 'experiences materially adverse consequences affecting the

terms, conditions, or privileges of employment or future employment opportunities

48

such that a reasonable trier of fact could find objectively tangible harm.'"

*Holcomb*, 433 F.3d at 902 (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130-31

(D.C. Cir. 2002).

Here, the record includes several examples of adverse actions: 1) Ms.

Brooks' "Minimally Successful" rating and lost bonus in 2006; 2) her

"Unacceptable" rating in 2008, which was accompanied by a lost bonus and a

Performance Improvement Plan; and 3) her reassignment to a "team" by herself

from May 2008 until the present and a temporary reduction in duties. *See supra* at

9, 11-13; R. 61-10; R. 70-8 at 2-4, 8; R. 70-27; R. 70-31.

Ms. Brooks has offered evidence that her poor ratings in 2006 and 2008

were unjustified and that her co-workers received substantial bonuses, although her

performance was stronger than, or at least comparable to theirs. *See supra* at 9, 13,

17-23. This Court has recognized that "a cash bonus diminished as a result of a

poor performance evaluation" can constitute a materially adverse employment

action for the purposes of a discrete retaliation claim. *Steele*, 535 F.3d at 696; *see*

*also Weber v. Battista*, 494 F.3d 179, 185-186 (D.C. Cir. 2007); *Burke v. Gould*,

286 F.3d 513, 522 (D.C. Cir. 2002); *Russell v. Principi*, 257 F.3d 815, 819 (D.C.

Cir. 2001). The 2008 "Unacceptable" rating was also coupled with a Performance

Improvement Plan, which would further discourage an employee from engaging in

protected activity.

49

Similarly, Ms. Brooks' treatment in the May 2008 reorganization would discourage protected activity. Instead of being assigned to work on a team with three other Team Leaders, as originally planned, she was isolated in a team by herself, an arrangement that persists to this day. R. 70-8 at 2-4. And, MSPB assigned her duties well below her GS-14 capabilities for a period following the reorganization. *Id.* A reduction in responsibilities may qualify as a materially adverse employment action for retaliation purposes. *See Holcomb*, 433 F.3d at 902 (Grade 11 employee who was performing tasks commensurate with Grade 5 established a materially adverse employment action); *Forkkio*, 306 F.3d at 1131 ("'[R]eassignment with significantly different responsibilities'. . . generally indicates an adverse action.") (quoting *Ellerth*, 524 U.S. at 761).

Finally, the adverse actions were causally connected to Ms. Brooks' protected activity. Temporal proximity is one way to establish causation, *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000), and there is strong evidence of temporal proximity between Ms. Brooks' protected activity and MSPB's acts of retaliation. Ms. Brooks received the 2006 evaluation only a few days after a meeting with EEO Director Mr. Matta. R. 70-4 at 3-4; R. 70-27. The May 2008 reorganization occurred less than three months after she filed her second formal EEO complaint. R. 70-8 at 2-4. And she received the 2008 evaluation about three months after filing her third formal EEO complaint. R. 70-31; R. 70-36. The

50

ongoing pattern of retaliation that occurred simultaneously with her repeated protected activity also establishes causation. *See supra* at 40-42; *see also Holcomb*, 433 F.3d at 903 (plaintiff established causation by showing that she "repeatedly engaged in protected activity during the period when she also experienced reduced work assignments").

To the extent that MSPB offers a legitimate non-discriminatory justification for its materially adverse employment actions, the record shows that its justifications would be pretextual. For example, should MSPB argue that Ms. Brooks' low 2006 and 2008 ratings were due to her poor performance, that explanation would be undermined by the fact that Mr. Hwang and Mr. Ngo did not downgrade her peers for the *exact same incidents* highlighted in her evaluations. *See supra* at 18-19. As for the May 2008 reorganization, MSPB's last-minute change of plans raises suspicions. Also, Mr. Ngo claimed that he and Mr. Hwang changed Ms. Brooks' placement in part due to her conflict with Mr. McDermott, R. 70-34 at 2, but this does not explain why they did not instead change *Mr. McDermott's* placement.

In sum, the record supports a prima facie case of retaliation, and MSPB's likely explanations for its retaliatory acts would be pretext. For these reasons, Ms. Brooks' retaliation claim should proceed to trial.

**CONCLUSION**

Because the district court failed to consider the totality of the circumstances in assessing Ms. Brooks' hostile-work-environment claim, this Court should reverse and remand that claim for trial. Because the district also erred in failing to consider Ms. Brooks discrete retaliation claim, and because the evidence on that claim raises disputed issues of material fact, this Court should reverse and remand that claim for trial as well.

Respectfully submitted,

/s/ *Anne W. King*_____
Anne King, D.C. Bar No. 996578
Brian Wolfman, D.C. Bar No. 427491
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, N.W., Suite 312
Washington, DC 20001
Tel: (202) 662-9546
Fax: (202) 662-9634
Email: ak682@law.georgetown.edu

Counsel for Appellant[*]

---

[*] Counsel gratefully acknowledges the substantial assistance of Jeremy Blasi and John Didday, third-year law students at Georgetown University Law Center, and Sandy James, a second-year law student at Georgetown, who played key roles in preparing this Brief.

52

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) because this brief contains **12, 643** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Times New Roman, a proportionally spaced typeface.

## CERTIFICATE OF SERVICE

I certify that the foregoing Initial Brief of Appellant Patricia A. Brooks

(Public Copy) was served on March 19, 2013 on appellee Susan Tsui Grundmann,

Chairman, Merit Systems Protection Board via this Court's Electronic Case Filing

system (ECF) and by personal service, to its attorney of record, John G. Interrante,

Assistant United States Attorney, U.S. Attorney's Office for the District of

Columbia, 501 Third Street N.W., Washington, DC 20001.


/s/ *Anne W. King*_____
Anne King, D.C. Bar No. 996578
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, N.W., Suite 312
Washington, DC 20001
Tel: (202) 662-9546
Fax: (202) 662-9634
Email: ak682@law.georgetown.edu

**ADDENDUM**

STATUTES AND REGULATIONS

**Table of Contents**

42 USC § 2000e–2 - Unlawful employment practices .................................................1

42 USC § 2000e–3 - Other unlawful employment practices.....................................1

42 USC § 2000e–5 - Enforcement provisions .........................................................2

42 USC § 2000e–16 - Employment by Federal Government....................................3

**42 USC § 2000e–2 - Unlawful employment practices**

(a) Employer practices

It shall be an unlawful employment practice for an employer—

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

[…]

**42 USC § 2000e–3 - Other unlawful employment practices**

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice

made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

[…]

## 42 USC § 2000e–5 - Enforcement provisions

[…]

(f) Civil action by Commission, Attorney General, or person aggrieved; preconditions; procedure; appointment of attorney; payment of fees, costs, or security; intervention; stay of Federal proceedings; action for appropriate temporary or preliminary relief pending final disposition of charge; jurisdiction and venue of United States courts; designation of judge to hear and determine case; assignment of case for hearing; expedition of case; appointment of master

(1) If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d) of this section, the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, or political subdivision. If a charge filed with the Commission pursuant to subsection (b) of this section, is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person

A-2

aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge

(A) by the person claiming to be aggrieved . . .

[…]

(3) Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought.

[…]

(j) Appeals

Any civil action brought under this section and any proceedings brought under subsection (i) of this section shall be subject to appeal as provided in sections 1291 and 1292, title 28.


**42 USC § 2000e–16 - Employment by Federal Government**

(a) Discriminatory practices prohibited; employees or applicants for employment subject to coverage

All personnel actions affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) in military

A-3

departments as defined in section 102 of title 5, in executive agencies as defined in section 105 of title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Regulatory Commission, in those units of the Government of the District of Columbia having positions in the competitive service, and in those units of the judicial branch of the Federal Government having positions in the competitive service, in the Smithsonian Institution, and in the Government Printing Office, the Government Accountability Office, and the Library of Congress shall be made free from any discrimination based on race, color, religion, sex, or national origin.

[…]

(c) Civil action by employee or applicant for employment for redress of grievances; time for bringing of action; head of department, agency, or unit as defendant

Within 90 days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) of this section, or by the Equal Employment Opportunity Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Equal Employment Opportunity Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e–5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

[…]